IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEREK WANDELL, | : | CIVIL ACTION NO. **1:CV-07-0026** |
| Plaintiff | : | (Judge Conner) |
| v. | : | (Magistrate Judge Blewitt) |
| MICHAEL J. ASTRUE,<br>Commissioner of<br>Social Security, | : | |
| Defendant | : | |

**REPORT AND RECOMMENDATION**

This is a Social Security disability case pursuant to 42 U.S.C. § 405(g), wherein the Plaintiff, Derek Wandell, is seeking review of the decision of the Commissioner of Social Security, ("Commissioner"), that denied his claim for Disability Insurance Benefits, ("DIB"), and Supplemental Security Income, ("SSI"), pursuant to Titles II and XVI of the Social Security Act, ("Act"). 42 U.S.C. §§ 401-433, 1381-1383f.

I.    **PROCEDURAL HISTORY.**

An application for children's SSI benefits was previously filed on behalf of Plaintiff in 1996. An Administrative Law Judge, ("ALJ"), denied Plaintiff's claim for child's SSI benefits on November 25, 1997. (R. 132-42). The Appeals Council denied review on July 19, 2000. (R. 33).

Plaintiff thereafter filed the current applications for SSI and DIB. (R. 33). Plaintiff protectively filed an application for SSI on October 16, 2000, alleging disability since September 28, 2000. (R. 269-73). Plaintiff filed an application for DIB on March 3, 2005. (R. 306-08). Plaintiff alleged disability due to diabetes, hypothyroidism, adrenal insufficiency, personality disorder, low testosterone, high liver function, fatigue, low heart rate, memory loss, pituitary gland, borderline intellectual functioning, depression and susceptibility to all diseases. (R. 35, 36, 310). The state agency denied his claim initially and he filed a timely request for a hearing. (R. 33). Hearings were held before an ALJ on December 10, 2001, April 14, 2004 and December 1, 2005. (R. 53-107, 108-26, 187-214).

Plaintiff was denied benefits pursuant to the ALJ's decision of December 29, 2005.  (R. 30-43).

Plaintiff requested review of the ALJ's decision.  On November 24, 2006, the Appeals Council declined to assume jurisdiction, thereby making the ALJ's decision the final decision of the Commissioner.  (R. 5-8).  42 U.S.C. § 405(g).

In compliance with the Procedural Order issued in this matter, the parties have filed briefs in support of their respective positions.  (Docs. 11 and 22).

## II.     STANDARD OF REVIEW.

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence.  *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552 (1988); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  It is less than a preponderance of the evidence but more than a mere scintilla.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he  is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

## III.   DISABILITY EVALUATION PROCESS.

A five-step evaluation process is used to determine if a person is eligible for disability benefits.  *See* 20 C.F.R. § 404.1520 (2004).  *See also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).  If the Commissioner finds that a plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further.  *See* 20 C.F.R. § 404.1520.

The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work.  *See* 20 C.F.R. § 404.1520.

In the present matter, the ALJ proceeded through each step of the sequential evaluation process and concluded that Plaintiff was not disabled within the meaning of the Act.  (R. 33-43).  At step one, the ALJ found that Plaintiff has not engaged in substantial gainful work activity since his alleged disability onset date.  (R. 42).  At step two, the ALJ concluded that Plaintiff's panhypopituitarism disorder,[1] borderline intellectual functioning and depression were "severe" impairments within the meaning of the Regulations.  (R. 42). At step three, the ALJ found that Plaintiff does not have an impairment, or combination or impairments, severe enough to meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.  (R. 42).

At step four, the ALJ found that Plaintiff has no past relevant work.  (R. 40-41).  At step five, the ALJ found that Plaintiff has the residual functional capacity, ("RFC"), to perform a significant range of sedentary work.  (R. 40-43).  Thus, the ALJ determined that Plaintiff has

---

[1]  Panhypopituitarism is "[a] state in which the secretion of all anterior pituitary hormones is inadequate or absent; caused by a variety of disorders that result in destruction or loss of function of all or most of the anterior pituitary gland."  *Stedman's Medical Dictionary*, 1304 (27th ed. 2000).

not been under a disability, as defined in the Act, at any time through the date of the ALJ's decision.  (R. 43).

## IV.    BACKGROUND.

Plaintiff was born on February 22, 1977 and was twenty-eight (28) years old at the time of the ALJ's decision.  (R. 35, 192, 374).  Therefore, he is considered a "younger person" under the Regulations.  20 C.F.R. §§ 404.1563(c), 416.963(c).

Plaintiff was diagnosed with a brain tumor in his pineal gland in January 1992, at the age of fourteen (14).  (R. 472, 482, 492, 566-67).  Plaintiff underwent surgery to remove the tumor, chemotherapy and radiation.  (R. 472, 482, 492-94).  The treatment resulted in a panhypopituitarism requiring lifelong hormone replacement therapy, however Plaintiff continually refused to take his medication.  (R. 472, 566).

Plaintiff began treating with Ferrol J. Lee, M.D., on January 26, 1998.  (R. 482-83). Dr. Lee treated Plaintiff for acute adrenal insufficiency, prompted by Plaintiff's noncompliance with taking his medications.  (R. 472, 482).

On May 14, 2000, Plaintiff was hospitalized due to dehydration.  (R. 397-99).  It was noted that Plaintiff suffered from panhypopituitarism and that he was noncompliant with his medications.  (R. 399).

On October 4, 2000, Plaintiff underwent an MRI of the brain which revealed no evidence of recurrent germ cell tumor and no mass lesions.  (R. 417).

On December 26, 2000, Plaintiff underwent a consultative psychological evaluation performed by James E. Williams, Ph.D.  (R. 418-27).  Dr. Williams administered the Wechsler Adult Intelligence Scale-III, ("WAIS-III").  (R. 423-24).  Plaintiff's scores ranged from poorer-than-average functioning to low-average functioning.  (R. 423).  Plaintiff scored a Verbal IQ of 77, a Performance IQ of 79 and a Full Scale IQ of 76, placing him in the borderline range of adult intellectual functioning.  (R. 424).

Dr. Williams diagnosed adjustment disorder with depressive features, tobaccoism, status post brain cancer with history of surgery and radiation, high liver functions, possible diabetes, adrenal insufficiency, low/absent testosterone levels, panhypopituitarism and

noncompliance with medication.  (R. 423).

On January 17, 2001, Thomas E. Fink, Ph.D., completed a Psychiatric Review Technique Form and evaluated Plaintiff's impairments pursuant to Listings 12.04 (Affective Disorders) and 12.05 (Mental Retardation).  (R. 428-41).  Dr. Fink determined that a Mental RFC Assessment and referral to another medical specialty were necessary.  (R. 428).  Dr. Fink found that Plaintiff suffered from depression and borderline intellectual functioning.  (R. 431-32).  Pursuant to the B criteria of the listings, Dr. Fink found that Plaintiff suffered from mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and no repeated episodes of decompensation.  (R. 438).

Dr. Fink completed a Mental RFC Assessment on January 17, 2001.  (R. 442-45).  He found that Plaintiff was moderately limited in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and the ability to set realistic goals or make plans independently of others.  (R. 442-43).  Dr. Fink found that Plaintiff was not significantly limited in all other areas of functioning.  (R. 442-43).

On January 25, 2001, Gerald A. Gryczko, M.D., completed a Physical RFC Assessment.  (R. 446-53).  Dr. Gryczko found that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday and was limited in pushing and pulling with the upper and lower extremities.  (R. 447).  Dr. Gryczko also found postural and environmental limitations.  (R 448, 450).

In December 2001, Dr. Lee opined that Plaintiff's inability to take his medications may be due to a central nervous system lesion.  (R. 472, 483).  Dr. Lee stated that Plaintiff would be unable to perform strenuous physical labor due to his pituitary hormone deficits.  (R. 473).

In February 2002, Dr. Lee informed Plaintiff that his hormone replacement medications could be lifesaving, however Plaintiff continued to refuse to take the medications. (R. 566-67).

In January 2003 and January 2004, Plaintiff reported to Dr. Lee that he felt well, however he continued to refuse to take his medications. (R. 568, 572, 574, 577).

Dr. Lee wrote a letter on April 14, 2004 stating that Plaintiff had not taken his medications for the prior three to four years. (R. 573). Dr. Lee stated that Plaintiff's unwillingness to take his medications, despite the fact that they could be lifesaving, was "completely baffling." (R. 573). Dr. Lee opined that Plaintiff has an underlying psychiatric impairment that prevents him from taking the medications. (R. 573).

In May 2004, Dr. Lee noted that laboratory tests revealed that Plaintiff suffers from severe vasopressin deficiency, LH and FSH, testosterone deficiency and growth hormone deficiency. (R. 579-80). Dr. Lee strongly recommended that Plaintiff take his medications. (R. 580).

Plaintiff underwent another consultative examination with Dr. Williams on May 26, 2004. (R. 581-87). Dr. Williams diagnosed adjustment disorder with depressive features (provisionally resolved), status post brain cancer with a history of surgery and radiation. (R. 585).

Plaintiff underwent a psychiatric evaluation with Eugene J. Pilek, M.D., on March 10, 2005. (R. 588, 590-94, 626-29). Upon mental status examination, Plaintiff was alert, oriented to all spheres and emotionally engaging in conversation, there was no evidence of psychosis and he was tearful and despondent at times. (R. 591, 627). Dr. Pilek diagnosed depressive disorder, NOS, panhypopituitarism, history of pineal tumor and he assessed a Global Assessment of Functioning, ("GAF"), score of 50 to 55.[2] (R. 626).

---

[2] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

Dr. Pilek noted that Plaintiff was emotionally engaging and fairly articulate.  (R. 588). He believed that Plaintiff was depressed, but that the depression was not the reason Plaintiff refused to have hormone replacement therapy.  (R. 588).

Plaintiff continued to treat with Dr. Pilek and counselors at Northern Tier Counseling. In June, July and August 2005, Plaintiff reported that he was willing to take his medications. (R. 616-20).

In August 2005, Plaintiff reported to Dr. Lee that he was willing to take his hormone medications.  (R. 604-05).

Plaintiff underwent a bone density study on August 17, 2005, which revealed that Plaintiff had severe osteoporosis of the spine and mild bone loss in the hip.  (R. 603).  Dr. Lee opined that the osteoporosis was due to inadequate hormones, especially testosterone. (R. 603).

On November 2, 2005, Plaintiff underwent a right knee arthroscopy and right partial medial meniscectomy, performed by Dermot Reynolds, M.D.  (R. 631).  Plaintiff tolerated the procedure well and was transferred to recovery in good condition.  (R. 631).  After the surgery, Dr. Reynolds noted that Plaintiff could return to full work duty without restriction. (R. 630).

Subsequent to the December 1, 2005 ALJ hearing, Dr. Lee wrote a letter to Plaintiff's attorney on December 4, 2005.  (R. 642-43).  Dr. Lee reviewed Plaintiff's medical history and noted that Plaintiff had a pineal tumor and hormone deficiencies when he was fourteen years old.  (R. 642).  He noted that Plaintiff underwent radiation and chemotherapy, which could have caused long term cognitive and neurologic problems.  (R. 642).  Dr. Lee thus opined that Plaintiff's irrational behavior could be related to his previous chemotherapy and

---

A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision*, 34, Washington, DC, American Psychiatric Association, 2000.  ("DSM-IV-TR").

radiation treatments.  (R. 643).  Dr. Lee also noted that in April 2004 Plaintiff was found to have pituitary ACTH, LH, growth hormone, vasopressin deficiency and primary thyroid hormone deficiency.  (R. 642).

## V.    DISCUSSION.

### A.  Whether the ALJ erred by not submitting additional questions to the medical expert and by not obtaining an opinion from a pediatric neurologist or a radiation specialist.

Plaintiff argues that the ALJ erred by failing to forward additional questions to Dr. Besen regarding Plaintiff's brain surgery, cranial irradiation and chemotherapy.  (Doc. 11 at 12).  Plaintiff further argues that the ALJ erred by failing to obtain an opinion from a pediatric neurologist or a radiation specialist.  (Doc. 11 at 12).  Defendant argues that the ALJ properly refused to comply with Plaintiff's requests.

As stated, Dr. Lee wrote a letter on December 4, 2005, subsequent to the December 1, 2005 ALJ hearing.  Dr. Lee opined that Plaintiff's irrational behavior could be related to his previous chemotherapy and radiation treatments.  Plaintiff therefore requested that additional questions be posed to Dr. Besen based on Dr. Lee's December 4, 2005 letter.  Alternatively, Plaintiff requested that the ALJ obtain an opinion from a pediatric neurologist or a radiation specialist.

At the December 1, 2005 ALJ hearing, the ALJ permitted Plaintiff to submit additional questions to Dr. Besen after the hearing.  (R. 106, 372-74).  However, the ALJ indicated that she was not sure the additional questions were necessary, noting that Dr. Besen's testimony had covered all pertinent information.  (R. 106).  In her decision, the ALJ acknowledged Dr. Lee's letter, stating that "Dr. Lee expressed the belief that the radiation used to treat the claimant's cancer may have caused long term cognitive and neurological problems."  (R. 40).  However, the ALJ then states that "while intellectual testing in the past demonstrates that the claimant has borderline intellectual functioning, it does not identify that the claimant's intellectual limitations are so limited as to render him unable to make knowing and willful decisions."  (R. 40).  Plaintiff argues that the ALJ did not address the possibility that the radiation and chemotherapy may have caused neurological problems, as well as cognitive

problems.  (Doc. 11 at 13).

The ALJ noted that the record revealed that taking medication would improve Plaintiff's condition.  (R. 106).  Dr. Besen testified that Plaintiff has a history of not taking his medications.  (R. 56).  Dr. Besen stated that whether Plaintiff's radiation and chemotherapy affected his ability to take medication is only speculation.  (R. 61).  Dr. Lee even stated that "it is certainly a *possibility* that much of Derek's irrational behavior over the past years, could very well be related to the chemotherapy and radiation therapy that he received at age 14." (R. 643) (emphasis added).  Dr. Lee advised that this should be considered when discussing Plaintiff's disability status.  (R. 643).

Dr. Besen stated that if Plaintiff takes his medications, his disease process could be kept very well in check and he could be gainfully employed.  (R. 56).  Dr. Besen noted that the medications for panhypopituitarism are very tolerable and proper titration leads to a totally, or almost totally, normal life.  (R. 58).  Dr. Besen opined that Plaintiff's underlying depression may have affected his decision-making ability.  (R. 59).  However, Dr. Besen noted that Plaintiff was only recently diagnosed with depression and the records reveal that he had not taken his medications for years.  (R. 60-62).  Thus, Dr. Besen opined that depression was not the sole reason Plaintiff did not take his medications.  Dr. Besen opined that Plaintiff made a "conscious effort" to not take his medications.  (R. 61).

Moreover, as Defendant notes, the additional questions are broad in scope and they require Dr. Besen to theorize or speculate regarding the effect and future impact of brain surgery, cranial irradiation and chemotherapy on a fourteen year old.  (Doc. 22 at 14) (R. 372-74).  As stated, Dr. Besen already testified regarding the effects of Plaintiff's prior radiation and chemotherapy treatments.  Substantial evidence supports the ALJ's decision not to forward Plaintiff's additional questions to Dr. Besen.

Regarding the Plaintiff's argument that the ALJ should have obtained an opinion from a pediatric neurologist or a radiation specialist, Defendant states that 20 C.F.R. §§ 404.1519a(b) and 416.919a(b) do not warrant remand.  (Doc. 22 at 16).  20 C.F.R. §§ 404.1519a(b), 416.919a(b) provide, in part, as follows:

(b) *Situations requiring a consultative examination.*  A consultative examination may be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on your claim.

Other situations requiring a consultative examination are also listed.  *See* 20 C.F.R. §§ 404.1519a(b)(1)-(5), 416.919a(b)(1)-(5).

Further, 20 C.F.R. §§ 404.1512(f) provides that when evidence needed to make a disability determination "is not readily available from the records of your medical treatment source, or we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense."

Plaintiff states that a pediatric neurologist or radiation specialist could have offered an opinion regarding the impact of Plaintiff's radiation and chemotherapy.  However, a review of the record before the ALJ reveals that the record was sufficient to support her determination.  As Defendant notes, the record contains evidence from Plaintiff's treating physicians beginning in 1992.  (Doc. 22 at 16).  Moreover, three separate ALJ hearings were held before two different ALJs to develop Plaintiff's case.  (R. 53-107, 108–26, 187-214).  Therefore, the ALJ did not err by not obtaining a consultative opinion from a pediatric neurologist or radiation specialist.

### B.  Whether the ALJ erred by concluding that medication could restore Plaintiff's ability to work.

Plaintiff next argues that the ALJ erred by stating that Plaintiff's medication would have restored his ability to work.  Plaintiff states there is no evidence supporting such statement. (Doc. 11 at 19).  Defendant argues that substantial evidence supports the ALJ's finding that Plaintiff would have been able to work if he took his medications.  (Doc. 22 at 17).  The ALJ stated that Plaintiff failed to take his medications until recently and if he took his medications, his ability to work would have been restored.  (R. 34).

Plaintiff states that during the time he resumed taking his medications, from September to December 2005, there is no evidence of improved stamina or less fatigue. (Doc. 11 at 19).

The Third Circuit in *Walker v. Barnhart*, 172 Fed. App'x 423, 427 note 2 (3d Cir.

2006), stated that "20 C.F.R. s. 416.918 [] provides, in effect, that an individual, who has a disabling impairment that is amenable to prescribed treatment which could be expected to restore his ability to work, cannot be found 'disabled' if he 'willfully fails' to follow such prescribed treatment."

As stated, Dr. Besen testified that Plaintiff could have performed gainful employment if he took his medications. (R. 56). Dr. Besen noted that the medications for panhypopituitarism are very tolerable and properly taking the medications could lead to a totally, or almost totally, normal life. (R. 58). Dr. Lee also addressed Plaintiff's noncompliance with his medications. Dr. Lee stated that Plaintiff's previous chemotherapy and radiation treatments would have an impact on his ability to recover, however he opined that Plaintiff's situation is different because he underwent chemotherapy and radiation on his brain during a growth stage. Similar to Dr. Besen, Dr. Lee stated that individuals can overcome the fatigue associated with panhypopituitarism and lead normal lives. (R. 642-43).

Substantial evidence supports the ALJ's finding that Plaintiff could have performed work if he was compliant with his medication regimen.

### C.  Whether the ALJ erred by concluding that Plaintiff was not justified in not taking prescribed medication.

Plaintiff argues that there was a valid mental reason for his choice to not take his medications. Plaintiff states that he made the choice to live his life as a teenager in an adult body without taking the hormones that would prolong his life. (Doc. 11 at 21). Plaintiff states there is a connection between his mental health counseling and taking psychotropic medication, which helped him make the decision to resume taking his medications. (Doc. 11 at 21).

20 C.F.R. §§ 404.1530(a), 416.930(a) provides "[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work." Further, 20 C.F.R. §§ 404.1530(b), 416.930(b) provide that "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are

11

already receiving benefits, we will stop paying you benefits."  Section (c) provides acceptable

reasons for failure to follow prescribed treatment.  *See* 20 C.F.R. §§ 404.1530(c), 416.930(c).

When determining if the claimant has an acceptable reason for failure to follow prescribed

treatment, the SSA will consider the claimant's physical, mental, educational and linguistic

limitations.  *See* 20 C.F.R. §§ 404.1530(c), 416.930(c).

In December 2000, Plaintiff reported to Dr. Williams that there were many reasons

he did not take his medication.  (R. 419).  Dr. Williams noted that Plaintiff's reasons were

inconsistent.  Plaintiff reported that he deliberately did not consistently take his medication

because of adverse side effects, it made him "gangly," it made him gain weight and he

preferred not to be medicated.  (R. 419, 422).  However, Plaintiff also reported that he did

not take his medication because he forgot and has a poor memory.  (R. 419, 422).

On April 14, 2004, Dr. Lee opined that Plaintiff must have an underlying

psychological impairment that prevents him from taking his medications.  (R. 573).

On March 15, 2005, Dr. Pilek stated that Plaintiff gave a "number of thoughtful

reasons for his decisions regarding the medical care he will allow."  (R. 588).  Dr. Pilek

believed that Plaintiff was depressed, but that his depression, or any mental illness, was not

the reason Plaintiff chose not to have hormonal replacement therapy.  (R. 588).

Based on the foregoing, Plaintiff has failed to present evidence of good reason for

failure to take his medications.

### D.  Whether the ALJ erred by failing to recognize Plaintiff's employer's accommodations.

Plaintiff testified that his past work at a mini-mart allowed him to sit at will or leave

work if necessary.  (R. 77).  Plaintiff argues that the ALJ erred by failing to address this

testimony.  (Doc. 11 at 22).

The ALJ noted that Plaintiff worked part-time at a mini-mart.  (R. 35).  Plaintiff

worked at the cash register and did no stocking.  The ALJ acknowledged Plaintiff's testimony

that he had the option to sit or go home when he was tired.  The ALJ also noted that Plaintiff

initially worked fifteen to twenty hours per week, but then reduced his hours to six hours

per week.  (R. 36).

On March 19, 2003, Plaintiff's supervisor at the mini-mart wrote a letter stating that the store manager made special accommodations for Plaintiff.  (R. 356).  She reported that Plaintiff was permitted to sit down when he was tired or not feeling well and he was allowed to go home if he was sick.  (R. 356).  Additionally, Plaintiff would still have his job if he called in sick and he was allowed more breaks than the other employees due to his illness. (R. 356).

The ALJ must consider all evidence before her and "must give some indication of the evidence which [s]he rejects and [] [her] reason(s) for discounting such evidence."  *Burnett v. Commissioner of SSA*, 220 F.3d 112, 121 (3d Cir. 2000).  "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."  *Cotter*, 642 F.2d at 705.

Upon review of the record, the ALJ considered the accommodations provided by Plaintiff's employer.  The ALJ provided for these accommodations by limiting Plaintiff to sitting for six hours during an eight-hour day, standing and walking for two hours during an eight-hour day, only lifting five pounds frequently and ten pounds occasionally and performing one to two step jobs without complex instructions.  (R. 40).  Based on the foregoing, there is a significant basis for a determination that the ALJ afforded adequate weight to the accommodations provided by Plaintiff's employer.

### E. Whether the ALJ erred by failing to consider the opinions of the treating physicians.

Plaintiff argues that the ALJ erred by not considering all of Dr. Lee's reports.  (Doc. 11 at 23).  The Court of Appeals for the Third Circuit set forth the standard for evaluating the opinion of a treating physician in the case of *Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000). The Court stated:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."  *Plummer* [v. *Apfel*, 186 F.3d 422, 429 (3d Cir.1999)] (*quoting Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir.1994); *Jones,*

954 F.2d at 128; *Allen v. Bowen*, 881 F.2d 37, 40-41 (3d Cir.1989); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Brewster [v. Heckler*, 786 F.2d 581, 585 (3d Cir. 1986)]. Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Plummer*, 186 F.3d at 429 (*citing Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)). The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. *See Adorno*, 40 F.3d at 48. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Kent [v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983)].

*Id.* at 317-318. Similarly, the Social Security Regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," it is to be given controlling weight. 20 C.F.R. § 416.927(d)(2). When the opinion of a treating physician is not given controlling weight, the length of the treatment relationship and the frequency of examination must be considered. The Regulations state: "Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source." 20 C.F.R. § 416.927(d)(2)(I). Additionally, the nature and extent of the treatment relationship is considered. 20 C.F.R. § 416.927(d)(2)(ii).

The ALJ evaluated Dr. Lee's reports and determined that his opinion was not entitled to controlling weight. (R. 36-40). The ALJ found that Dr. Lee's opinions are inconsistent with the other evidence of record. (R. 40). The ALJ noted that the evidence does not reveal that Plaintiff's intellectual limitations are so limited as to render him unable to make knowing and willful decisions. (R. 40). Dr. Lee found that Plaintiff was incapable of performing strenuous physical labor. Despite this finding, Defendant argues that Plaintiff is still capable of performing less strenuous work. (Doc. 22 at 22).

14

Defendant further states that the ALJ did not err by crediting Dr. Besen's opinion. (Doc. 22 at 22). Defendant notes that Dr. Besen's opinion is consistent with the medical findings. State agency consultants are "highly qualified" physicians and experts in the evaluation of the medical issues in disability claims under the Act, and their opinions must be considered by the ALJ. *See Social Security Ruling* 96-6p and 20 C.F.R. § 404.1527(f). The ALJ thoroughly evaluated Dr. Besen's opinions. (R. 36-37, 40). The ALJ noted that Dr. Besen testified that if Plaintiff had taken his medications, his physical capacity would have improved and titrating the medications would have reduced his side effects. (R. 40).

Thus, the ALJ found that, with appropriate medication, Plaintiff would retain the RFC to sit six hours during an eight-hour day, stand and walk for two hours during an eight-hour day, occasionally lift ten pounds, frequently lift five pounds, and perform one to two step jobs without complex instructions. (R. 40). Substantial evidence supports the ALJ's findings and evaluation of the opinions of Dr. Lee and Dr. Besen.

### F. Whether the ALJ erred by failing to send Plaintiff for a new consultative mental health examination.

Plaintiff states that the ALJ erred by refusing to send him for an updated mental health consultative examination with a consultant other than Dr. Williams. (Doc. 11 at 24). Plaintiff argues that Dr. Williams did not provide an objective opinion and his case should be remanded for an objective evaluation. (Doc. 11 at 25). Plaintiff states that Dr. Williams failed to render an objective evaluation because he and Dr. Williams got into an argument.

Defendant notes that Plaintiff never requested that the current ALJ, Ellen Ritteman, send him for an updated mental health examination. (Doc. 22 at 22). Plaintiff requested that a prior ALJ, John Fraze, send him for a new examination. (Doc. 22 at 23) (R. 359). However, ALJ Fraze denied Plaintiff's request. Defendant argues that there is no evidence that ALJ Ritteman would have ruled any differently than ALJ Fraze. (Doc. 22 at 23).

As stated, Dr. Williams evaluated on December 26, 2000. (R. 418-27). Dr. Williams administered the WAIS-III test and Plaintiff's scores ranged from poorer-than-average functioning to low-average functioning. (R. 423-24). Plaintiff's scores placed him in the

borderline range of adult intellectual functioning.  (R. 424).

Dr. Williams diagnosed adjustment disorder with depressive features, tobaccoism, status post brain cancer with history of surgery and radiation, high liver functions, possible diabetes, adrenal insufficiency, low/absent testosterone levels, panhypopituitarism and noncompliance with medication.  (R. 423).

Dr. Williams found that Plaintiff had good ability to use judgment, deal with work stresses and maintain attention/concentration.  (R. 426).  Plaintiff had unlimited/very good ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors and function independently.  (R. 426).  Plaintiff had good ability to understand, remember and carry out complex job instructions, detailed but not complex job instructions and simple job instructions.  (R. 426).  Plaintiff had unlimited/very good ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability.  (R. 427).

Plaintiff underwent another consultative examination with Dr. Williams on May 26, 2004.  (R. 581-87).  Dr. Williams diagnosed adjustment disorder with depressive features (provisionally resolved), status post brain cancer with a history of surgery and radiation.  (R. 585).

Dr. Williams found that Plaintiff had marked limitation in the ability to carry out detailed instructions.  (R. 586).  Plaintiff had moderate limitations in the ability to understand and remember detailed instructions and make judgments on simple work-related decisions.  (R. 586).  Plaintiff had slight limitations in the ability to understand and remember short, simple instructions and carry out short, simple instructions.  (R. 586).  Dr. Williams opined that Plaintiff's ability to respond appropriately to supervision, co-workers and work pressures was not affected by his impairment.  (R. 586).

A review of the record reveals that substantial evidence supports the ALJ's evaluation of Dr. Williams' reports and there was no need to obtain a new consultative examination.

### *G. Whether the ALJ erred by failing to find Plaintiff credible.*

Plaintiff's last argument is that the ALJ erred by failing to find him credible.  (Doc. 11 at 25).  Defendant states that the ALJ properly evaluated Plaintiff's credibility and the ALJ extensively considered Plaintiff's allegations.  (Doc. 22 at 24-25).

When considering a claimant's subjective complaints of pain, an ALJ must engage in a two-step analysis.  First, an ALJ must determine if the alleged disabling pain could reasonably result from the medically determinable impairment; and second, the ALJ must consider the intensity and persistence of the claimant's disabling pain, and the extent to which it affects his ability to work.  *See Diaz v. Commissioner of Social Security*, 39 Fed. App'x 713, 714 (3d Cir. June 12, 2002).

"'[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 531 (6th Cir.1997); *see also Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir.1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.')."  *Frazier v. Apfel*, 2000 WL 288246 (E.D. Pa. March 7, 2000).

The ALJ concluded that Plaintiff's testimony was not fully credible.  (R. 39).  The ALJ noted that Plaintiff misled his doctors regarding his medication and his statements have not been consistently accurate since he misled his doctors about what medications he was taking.  (R. 40).  Plaintiff reported to his doctors that he was taking medications, when in fact he was not taking the medications.  (R. 419, 422).  Plaintiff reported to Dr. Williams that he told his doctors he was improving with medication although he was not even taking his medication.  (R. 419).

Further, Plaintiff testified that he suffered from extreme fatigue and limited exertion, however he reported no significant problems to Dr. Lee.  (R. 39).  The ALJ stated that there is no objective evidence supporting Plaintiff's claim that he requires full rest after working for a few hours and the record does not support Plaintiff's claims of extreme limitations.  (R. 39-

40).  The ALJ noted that, from the time Plaintiff stopped taking his medications until the time he resumed taking them in 2005, he received no significant treatment.  (R. 40).  Despite Plaintiff's inactivity, there is no evidence of atrophy.  (R. 40).  Considering the evidence of record and Plaintiff's inconsistent statements to his doctors, substantial evidence supports the ALJ's finding that Plaintiff was not entirely credible.

## VI.      RECOMMENDATION.

Based upon the foregoing, it is respectfully recommended that Plaintiff's appeal be **DENIED**.

**s/ Thomas M. Blewitt**
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated:  May 12, 2008**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DEREK WANDELL,                           :        CIVIL ACTION NO. **3:CV-07-26**
                                         :
   Plaintiff                             :          (Judge Conner)
                                         :
   v.                                    :        (Magistrate Judge Blewitt)
                                         :
MICHAEL J. ASTRUE,                       :
Commissioner of                          :
Social Security,                         :
                                         :
   Defendant                             :

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated **May 12, 2008.**

Any party may obtain a review of the Report and Recommendation pursuant to

Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings,
> recommendations or report addressing a motion or matter described in
> 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
> disposition of a prisoner case or a habeas corpus petition within ten (10)
> days after being served with a copy thereof.  Such party shall file
> with the clerk of court, and serve on the magistrate judge and all
> parties, written objections which shall specifically identify the
> portions of the proposed findings, recommendations or report to which
> objection is made and the basis for such objections.  The briefing
> requirements set forth in Local Rule 72.2 shall apply.  A judge shall
> make a *de novo* determination of those portions of the report or
> specified proposed findings or recommendations to which objection
> is made and may accept, reject, or modify, in whole or in part, the findings
> or recommendations made by the magistrate judge.  The judge, however,
> need conduct a new hearing only in his or her discretion or where

required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

s/Thomas M. Blewitt
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: May 12, 2008**